## JENKINS PORTER v. STATE.

No. A-6752.   Opinion Filed September 14, 1929.
(280 Pac. 859.)

H. A. Stanley, H. H. Brown, and Brown & Williams, for plaintiff in error.

Edwin Dabney, Atty. Gen., for the State.

DAVENPORT, J.   The plaintiff in error, hereinafter called the defendant, was tried upon an information charging him with murder of one Sylman Bell, and convicted on manslaughter in the first degree and his punishment fixed at confinement in the state penitentiary at hard labor for a period of four years.   Motion for new trial was filed, considered, and overruled, and exceptions saved, and defendant has appealed to this court.

The testimony on behalf of the state is, in substance, as follows: That the deceased and the defendant, together with other parties, started from Ardmore and got out a few miles from town; that the remains of Sylman Bell was found by Albert Musgraves, and he went to the

Church place and called the officers; Bob Bell and Con Keirsy came out and helped load the body of Sylman Bell into the ambulance. The witness described the place where the body was found. Bell further testified that he made an examination of the body for wounds; that he found some wounds on the head of the deceased; that he had been hit on the head; there were two blood puddles, one about four feet from the other; it looked like the deceased had fallen in one place and rolled over two or three times and died. Witness further stated he picked up a rock that was bloody and had some hair on one corner of the rock.

On cross-examination, witness stated there were no more rocks where he found this one as big as the one that was being inquired about.

"There was some gravel where the blood ran out, and at the place where the body was found, and two puddles of blood, it was not far though, not over three or four feet apart; the rock I picked up was a foot from the body; it was lying just a little ways from the body, a little ways from his head, but I don't remember which direction."

Jess Dunn, a witness for the state, testified he went out to look for the defendant and arrested him about 1½ miles from the Rocky Point schoolhouse, which was about 4 miles southeast of Ardmore.

"I talked with the defendant the day I arrested him, and he said it had been four or five days since he had seen the deceased. I arrested the defendant and came back toward Ardmore, and then turned back and went to Love county. I was trying to locate the two Phillips boys. I found them at a dance at Sidney Lafountaine's in Love county. About two hours after I arrested the defendant, he told me he and Sylman Bell had had a fight that night."

On cross-examination he stated,

"He arrested Jimmie Phillips in the afternoon after the body was found that morning. He did not know what time the body was found."

Dr. Walter Hardy was called, and testified as to the wounds on the body of Sylman Bell, and that they were sufficient to cause death.

Sid Phillips, a witness for the state, testified: He knew Jenkins Porter and had known him for a long time; Jenkins Porter was his uncle. He knew Jimmie Phillips; he was his first cousin. That he knew Sylman Bell, had known him for about a year. In the afternoon before this trouble came up, he and Sylman Bell, Jenkins Porter, and Jimmie Phillips had been to Ardmore. He and Jimmie Phillips bought some canned heat and started home.

"Me and Jimmie was fixing up the canned heat when Jenkins Porter and Sylman Bell caught up with us on the road. We all drank of this canned heat, and after we drank the first drink of canned heat we all went on toward home. A car passed us about that time and turned off east of this north and south road. We went on up the road, and Jimmie went ahead. Me, Sylman, and Jenkins started on down the road where Jimmie was. We got down about halfway, and Jenkins came back the west road. After we all got back, I called Jenkins; he was over on the west side of the fence. He got up and came over in the road. We were all about half drunk. Sylman said Jenkins was not man enough to go away and meet them nigger. Jenkins said he did not want to fool with nigger. We drank some more heat and then went down the road south to a culvert close to Mrs. Church's tank. We fixed some more canned heat to drink. Me, Jimmie, and Jenkins stayed there in the road, and Sylman went for some water. Sylman and Jenkins had not had any fight at that time. After that

we all went to the tank. We drank one can of canned heat and started back to the road. Sylman said Jenkins was not man enough, and Jenkins said he did not want nigger, and about that time Sylman hit Jenkins and knocked him down. I don't know whether this is the rock Jenkins had or not. Jenkins hit Sylman with a rock. Sylman was lying down when Jenkins hit him."

Witness then got down and indicated to the jury the position Sylman Bell was in at the time Jenkins Porter hit Bell with a rock. Witness was also permitted to take the rock and indicate to the jury how the defendant used it when he struck the deceased with it.

"When Jenkins struck Sylman Bell with the rock, I said, 'Let's go home.' Some one struck a match, and I found the other fellow had blood on his face. Jenkins left there and went across the field. Jimmie and I went home; we were living southwest of there."

On cross-examination the witness stated: He was 24 years old; he had been in jail about four days; the county attorney stated he had just been there in jail as a witness.

"The evening of the fight Jimmie and I left town about 7:30 o'clock, about sundown, and about 15 minutes after we left we came up with Sylman and Jenkins walking. We had eight cans of canned heat. When we come to the road where it turned east down there, Sylman wanted to go down and get one of the negro girls, but insisted on us all going, and we sent Jimmie down first, Jenkins and Sylman and me went in west on the west road, and when Jimmie, Sylman, and I came back we came back on the main road. I called Jenkins; he was inside the fence. Sylman said Jenkins ain't man enough to take that nigger girl, and Jenkins said he don't want to fool with nigger. We went on down the road about a half mile and stopped at a bridge; I don't know how long we stayed there."

Witness was then asked if he did not testify in the preliminary trial about two hours, and answered:

"Yes. The last fight was in the pasture, not in the road. We did not pull Sylman Bell from the road over into the pasture after the fight. When Sylman and Jenkins started fighting, we was out in the road going home; I was ten steps ahead of them. I did not see Sylman stomp him with his feet. Sylman hit Jenkins down, and Jenkins hit Sylman down. I did not see Sylman stomp Jenkins when he knocked him down. I never noticed either of them have a knife. When Jenkins hit twice, I ran up towards Jenkins and pulled him off; he had already stopped fighting at that time. I seen him hit the deceased. There was no cussing there between Sylman and Jenkins. We were over in the pasture about two hours the first time we stay there; the next time we went to pasture we then went from pasture back into the road. We went off and left Sylman lying there on the ground. I did not hit him with a rock or anything. I did not touch the body after the fight. I went on and thought he would get all right and go home; found out next day he was dead. I did not go back the next day to see whether he had gotten up and gone home, did not think there was anything much the matter with him. I did not see Jenkins any more that night after I left the place where the fight occurred. Jenkins went west, and me and Jimmie south. After the fight, Sylman laid down on his side (indicating), and I put him straight leg; that is all I did; I did not turn him over."

On redirect examination the witness stated Sylman knocked Jenkins down with his fist and Jenkins got up and knocked Sylman down, and then Jenkins hit him with rock; Jenkins and Sylman had just one fight.

Witnesses were then called to show that Jimmie Phillips was in bed with a broken leg and unable to attend the trial.

The defendant testified, in substance: That he was a full-blood Mississippi Choctaw; he knew Sylman Bell; that he saw Sylman Bell the afternoon of the trouble that night. Witness was asked about canned heat, and explained as best he could, and said that in order to drink it he mixed water with it.

"After we got out to the Bailey place, we saw Sid and Jimmie Phillips next to the road. They called us down there. We fixed up canned heat with soda pop and taste some of that. We drank that up. Sylman Bell went off to get some more canned heat; eight more cans. Sid go to town to get it. Sylman accused me of stealing some of his canned heat, and he had me stand up and searched me, though he did not find any canned heat on me. We left the Bailey place and went on up the road a little further, about a half mile I believe. A car came along, and we stopped there and the road turned east. The car stopped in about 100 yards, and we heard laughing and talking in the car; boys and girls, women and girls and men too. I did not go down to the car. He wanted to send Jimmie down there, and I said, 'Jimmie don't go down there, you might get into trouble.' Sylman said he was doing this. I would not go down there with him. I changed my mind and jumped over in the pasture fence there on the side of the road and stayed there until he came back. Sylman called me. He said: 'What devil you wait here? You are afraid of people. If you will come with us we will get these girls out of the car.' And he said, 'We can use it all night long,' that what he say. Tell him I just stay in jail a week, and chief of police say just don't drink anything more like that, no more trouble. Sylman he say I not man enough, we could have got it all night with girl. That all he say from about there. We getting water to fix up heat over by Mrs. Church's tank. We all went into Mrs. Church's pasture and drank heat, and he wanted me to get water; I don't, cause if I get water Mrs. Church find out we like to get into trouble. He said, 'You just always afraid of somebody.' This gone on hours, 'You

going to bring it, I am going to kill you anyway.' I said, 'I may be in hospital, I ain't able to fight you.' I don't know what I did about that time when I hit the ground, hit him so hard I don't know when I hit ground. I guess I fall I was on the ground. After I was on the ground, he stomped me, last time over arm on my face, spit in my face, and stomped me like a baby. I got on my knees and knocked him back, and I got up, and I reached back that way (indicating). I had something in my hand; I thought it was a clod of dirt I had in my hand. I can't use my hand at all. He say, 'I thought I killed you, I am going to finish up,' and I walked back about 20 yards and get to fence and could not go any further, and he said, 'I am going to finish up,' I got to do something. I hit him and missed him; the second time I knocked him away. As he come at me the last time, he said he was going to cut that head off, my head off."

Witness then explained the position he was in in the corner of the fence and what the deceased was doing to him. Then witness states:

"He reached in pocket and hit me like this, and I hit him right on the side of the head; some way I miss him, and he dodge back and I hit him; he did not get up any more. I did not hit him after he fell, I ain't there; after he quit coming toward me, I turned and walked off; I no wait to see what happen to him, I ain't there. When I hit him I did not intend to kill him; I was trying to get away from him, just trying to keep him off of me. At the time we had the trouble I weighed 127 pounds, Sylman Bell weighed nearly 200, I guess 180. The last time I drunk with Sylman Bell, he was a pretty bad fellow; when he came at me, he said he was going to finish me. It was so dark I could not see if he had anything in his hand."

On cross-examination the defendant stated he was 36 years old; that he and the deceased were on good terms when they started on the road that night.

"I never did tell nobody until now about Sylman going to take my wife; you say steal, he say he was going to take my wife; Sylman Bell, he hit me, knocked me, slap me, spit over my face, pretty bad off, stomped me on my face, bruised me; after I got throwed in jail, I was sick a week; did not knock any skin off my face; like to break one of my ribs; I struck at him once and missed, and the second time I knocked him over I guess he stayed there; I left, when just about 40 yards from him Sid was with him; he was not right there with me; I did not go back; I did not run away; I did not run at all; after I hit Sylman, I went west, I stayed about a half a mile from the road that night out south; set down on the ground and went to sleep; next day I come to town; I did not go back to see Sylman. Jess Dunn told me Sylman was dead, and the next evening I was put in jail."

Con Keirsy was recalled, and testified he went out and examined the body of the deceased, and that he did not have any knife. This is in substance the testimony of the state and the defendant.

Several errors are assigned by the defendant as grounds for reversal of this case. It is first contended that the trial court erred in admitting certain incompetent, irrelevant, and immaterial evidence. The principal argument made by the defendant is that the trial court permitted the introduction of a certain rock without a sufficient predicate being laid for the introduction. The testimony of Bob Bell shows that the rock admitted in evidence was found within a foot and a half or two feet of the body of the deceased. Sid Phillips, who was present at the time of the fight between the defendant and the deceased, testified that defendant struck the deceased twice with a rock, but could not positively identify the rock admitted in evidence as being the rock used by the defendant. The defendant admitted striking the deceased, and states that when the deceased knocked him down, when he got up

he had something in his hand which he thought was a clod of dirt, and that he struck the deceased and knocked him down, and he then left the scene of the difficulty. We do not think the court erred in permitting the introduction of the rock, over the objection of the defendant.

It is next contended by the defendant that the trial court erred in giving certain instructions to the jury. He urges that the instruction of the court which covers the exact language in the information was error. With this contention we cannot agree. We think that it is the duty of the court to either read the information, or state the allegations substantially as they are in the information, as the burden is upon the state to prove each and every material allegation in the information.

We have carefully examined the other errors assigned by the defendant, but when they are considered in connection with the testimony in this case, and the circumstances surrounding the difficulty, we do not think they are sufficient to justify this court in reversing the case. All the parties to this case are full-blood Choctaw Indians, who do not speak English very well. They were all more or less intoxicated at the time of the difficulty. There is a conflict in the testimony of the state and the defendant as to what, if anything, the defendant used in the fight with the deceased. The defendant admits striking the deceased and knocking him down. Where there is conflict in the testimony, this court will not substitute its judgment on questions of fact or the weight of the evidence for that of the jury. Where there is competent testimony from which the jury may reasonably and logically find the defendant guilty, even though the evidence may be conflicting or such that different inferences may reasonably be drawn therefrom, this court will not disturb the verdict.

The testimony is sufficient to sustain the judgment. The instructions of the court were fair to the defendant and substantially stated the law.

Finding no errors in the record, the judgment is affirmed.

EDWARDS, P. J., and CHAPPELL, J., concur.